IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**DANIEL PETERSON,**

      **Plaintiff,**

**vs.**                                           **Case No.  2:19-cv-2050**

**MINERVA SURGICAL, a Delaware Corporation,**
**and DAVID CLAPPER, an individual,**
      **Defendants.**

## COMPLAINT

Plaintiff Daniel Peterson ("Peterson"), for his Complaint against defendant Minerva Surgical ("Minerva"), and David Clapper ("Clapper") states and alleges as follows:

1.      Plaintiff Peterson is an individual and resident of Olathe, Kansas.

2.      Defendant Minerva is a Delaware corporation based in Redwood City, California.

3.      Defendant Clapper is an individual and resident of California.

4.      Jurisdiction and venue are properly placed inasmuch as all transactions relevant to this action arose and/or occurred in the state of Kansas; subject matter jurisdiction is proper given the fact that plaintiff possesses a Right to Sue notification issued him by the Equal Employment Opportunity Commission dated December 4, 2018.

1

## FACTUAL BACKGROUND

**Plaintiff's Accommodation History:**

5.      Plaintiff Peterson was previously employed by defendant Minerva for over two and a half years with his most recent position entitled Area Sales Director, which became effective May 2016 after leading the company as a top-performing sales representative and acting as a principal sales interface with the Minerva engineering team.

6.      Plaintiff Peterson's hiring was predicated on both his sales expertise and his prior successful business relationship with defendant Minerva's President and CEO, defendant Clapper.

7.      During the course of plaintiff's employment with defendant Minerva, plaintiff performed his assigned work in a successful and competent manner on behalf of defendants.

8.      Prior to his involuntary termination, plaintiff was recognized as a high-performing Area Sales Director and Territory Manager in terms of total revenue since the inception of defendant's sales and marketing department.

9.      Throughout his tenure as an Area Sales Director, plaintiff was seen as a respected, trusted, and fair manager as well as a clinical and technical expert by the Minerva sales and engineering teams.

10.      Due to plaintiff's respected and trusted position with the Minerva sales and engineering teams, he was often the go-to resource for those with concerns, whether related to product functionality, patient safety, training deficiencies, poor morale, inequity of treatment, and/or retaliation.

11.      Plaintiff Peterson suffered from one or more disabling conditions during the course of his employment with defendant Minerva, and these conditions were known to defendants prior to their

2

termination of plaintiff Peterson.

12.     During the course of his employment with defendant Minerva, plaintiff Peterson possessed one or more disability conditions, including a Stress/Anxiety condition, and a military service-connected condition involving a severe injury to his cervical spine which together substantially impaired one or more of his major life activities, which conditions were exacerbated by his workplace environment at Minerva.

13.     Plaintiff Peterson's upper supervision, Dave Clapper and Thomas Pendlebury, as well as Human Resources Director Wendy Bowman, were aware of his disabling conditions, and plaintiff's requests for reasonable accommodation.

14.     Plaintiff Peterson initiated a leave of absence as a reasonable accommodation for his protected disabling conditions in mid-April, 2018.

15.     Thereafter, over the next several months, Plaintiff also sought various reasonable accommodations to allow for his successful return to the defendant's workplace upon the completion of his protected leave of absence.

16.     Despite plaintiff's proper expressions of concern, defendant denied reasonable accommodation to plaintiff Peterson; Minerva falsely has alleged that they made good faith efforts over the course of several months to provide reasonable accommodations when, in fact, defendant Clapper and others privately advised other Minerva employees during the same time frame that plaintiff "would not be returning." Further, Minerva promptly reorganized managerial alignment upon Peterson's leave of absence, deceitfully portraying it as temporary, notwithstanding reassigned management making it clear to plaintiff's former direct reports the new reporting structure was permanent.

17.     While on leave of absence plaintiff sought alternative employment including employment with one such prospective employer, Arrinex Incorporated ("Arrinex") in an attempt to resolve the situation and provide for his family by simply removing himself from his unhealthy work environment.

18.     However, defendant Clapper proactively interfered with Peterson's economic opportunity to gain employment with Arrinex. Clapper's undisputed contact with Arrinex in this regard corresponded with a phone call to plaintiff on or around June 6, 2018 by Arrinex effectively terminating the employment opportunity. The referenced phone call from Arrinex to plaintiff is further affirmed by an email subsequently sent to Arrinex by plaintiff as a thank you for "bringing [Clapper's call to Arrinex's corporate office] to my attention" and to expressly state the information "disgracefully" provided was "untrue and defamatory."

19.     Minerva and defendant Clapper concurrently utilized plaintiff's weakened position of being on unpaid leave and unable to find alternative employment in an attempt to obtain a resignation from plaintiff, and/or to deny plaintiff's requested reasonable accommodations.

20.     Because of plaintiff's inability to gain alternative employment due to unlawful interference by defendant Clapper, Peterson was then forced to return to Minerva's unhealthy work environment despite not being provided the requested accommodations.

21.     Given plaintiff's impairment was attributed to his work circumstances, returning to work without provision of his requested accommodations could predictably exacerbate his symptoms.

22.     Despite multiple attempts on his part to resolve the issues surrounding accommodation, plaintiff was not allowed to return to work by defendant Minerva, which in turn retroactively and inaccurately asserted that it had returned plaintiff Peterson to unpaid leave status regardless of

plaintiff having provided all legally required documentation and presenting himself as willing and able to work.

23.     Ultimately, Executive Management's Dave Clapper and Thomas Pendlebury and Human Resources' Wendy Bowman denied plaintiff Peterson the ability to return to work, resulting in his involuntary, unlawful, retaliatory termination from employment on or around August 3, 2018.

24.     Defendant Minerva deceptively attempted to position the aforementioned involuntary, unlawful, retaliatory termination as a voluntary resignation.

25.     Subsequently, at the conclusion of an internal Minerva meeting held after plaintiff's involuntary termination, defendant Clapper pulled aside various Minerva sales team members who previously reported to plaintiff Peterson and provided fictionalized information, intentionally misconstrued events, and created a defamatory story to support Minerva's position as to plaintiff Peterson.

26.     The aforesaid meeting concluded with Clapper stating Peterson "is no friend of Minerva."

**Employee Handbook Matters:**

27.     Defendant Minerva further demonstrated disregard for the Employee Handbook over the span of Plaintiff's employment with defendant, inclusive of sexist remarks and/or behaviors made openly to subordinate employees by company sales/marketing head Thomas Pendlebury.

28.     In addition to its disregard for its published Employee Handbook, defendant Minerva engaged in numerous violations of accepted human resource protocol, including unlawful discrimination, violation of labor codes, total targeted compensation changes in breach of employment agreements, inconsistent and inequitable treatment of sales employees, retaliatory

5

territory splits, dispensation of retaliatory, punitive commission rates, various other forms of retaliation, and by failing to properly address employee concerns of a hostile work environment.

29.     The aforementioned disregard for the Employee Handbook coupled with violations of accepted HR protocol resulted in unification of the top performing sales representatives in late 2016/early 2017 to provide awareness of allegedly "grave concern" to executive management.

30.     Defendant Minerva's Chief Operations Officer, who reported directly to defendant Clapper and oversaw the engineering team, also spoke to company officials Pendlebury and Clapper regarding his awareness of sales employees' concerns and the likelihood of sales leaders breaking chain of command to voice these concerns.

31.     These concerns were presented to defendant's Vice President of Sales & Marketing Thomas Pendlebury and Clapper on behalf of the sales leaders by the Area Sales Directors in the first quarter of 2017, resulting in retaliation against such individuals.


**Retaliatory Treatment:**

32.     Defendant's leadership officials Pendlebury and Clapper demonstrated a pattern of retaliatory behavior over the span of plaintiff's employment.

33.     Pendlebury, Peterson's direct supervisor, exhibited a retaliatory and vindictive management style towards plaintiff, including handling of MBO payments, inequitable compliance and oversight of expense policy and reimbursement, punitive organizational realignments, treatment of job candidates with intent to negatively effect plaintiff's headcount and achievement, manufacture of human resources issues to create fictional documentation trails, and defamation of plaintiff's character, integrity, and abilities.

34.     In mid-January, 2018, defendant Minerva held a national sales meeting attended by plaintiff Peterson, the Minerva sales force, and key members of Minerva's Operational and engineering teams.

35.     At said meeting, one or more discussions occurred which concerned the performance of defendant Minerva's principle product.

36.     Prior to this meeting, defendant Minerva had introduced a redesigned medical device product (the "ES device"), which effectively replaced the original endometrial ablation product manufactured by Minerva.

37.     It was also shared privately and directly to plaintiff by members of Minerva's engineering team, who were instrumental in device safety modifications and design, that defendant Clapper personally took credit for the original device "advancement" (which ultimately became known as ES) by putting his name on the patent for the updated and redesigned Minerva ablation product.

38.     Direction was given by defendant's managerial officials Pendlebury and Clapper for Minerva's sales personnel to communicate ES as a device "advancement" or enhancement versus a necessary improvement.

39.     Plaintiff aided in the design of the ES device, including the creation of a conceptual sketch incorporating limitations of the original ("Classic") device.

40.     Subsequent to plaintiff being made aware of defendant Clapper personally taking credit for device improvement, plaintiff contacted a patent attorney and was educated on the difficulty of overcoming assignment of invention clauses in employment agreement, regardless of Clapper's deceptive and unconscionable behavior.

41.     In addition to the Minerva Classic device's inherent design limitations, defendant Minerva

provided inadequate training on key aspects of the device.

42.    Defendant's managerial officials Pendlebury and Clapper gave conflicting direction to the Minerva sales force concerning the Classic device vis-a-vis the ES device.

43.    In early March, 2018, plaintiff Peterson received a confusing and odd voicemail from Pendlebury addressing the "expired devices."

44.    In the latter half of 2017 and first half of 2018, plaintiff fielded numerous inquiries from members of his sales team, and others, regarding questions surrounding defendant Minerva's original, "Classic" product; which questions plaintiff in turn shared with upper management of defendant Minerva.

45.    Defendants Minerva and Clapper informed the sales force - including plaintiff Peterson - that Minerva would not recall or replace the "Classic" devices manufactured by Minerva.

46.    Instead, defendants identified to their sales force, inclusive of plaintiff, that sales employees should sell the enhanced "ES" devices, while leaving "Classic" devices on customers' shelves and in representatives' inventory to be used through the date of their expiration.

47.    Plaintiff Peterson was justifiably concerned about informing Minerva customers and sales representatives of any issues relevant to performance of the "Classic" device.

48.    On or about April 17, 2018, Thomas Pendlebury left plaintiff Peterson an additional voicemail of an odd and confusing nature.

49.    Pendlebury further stated in the above-referenced voicemail to plaintiff that he was greatly concerned about internal communications relative to the issues surrounding the "Classic" device.

50.    At this time, defendant possessed no apparent or express intention to deal with any issues surrounding performance of the "Classic" devices.

51.     On or about April 17, 2018, plaintiff Peterson again contacted defendant's upper management and expressed explicit concerns relating to the direction given to the sales team relative to the "Classic" device.

52.     Thereafter, defendants continued to refuse to address plaintiff's questions and concerns as to the Classic device.

53.     Plaintiff Peterson justifiably was concerned that defendants' collective lack of action and/or clarification constituted a violation of Kansas criminal statute K.S.A. 21-6503 making any form of "deception, fraud, false pretense, false promise, or misrepresentation of a material fact … in connection with the sale of any merchandise" criminally illegal in the state of Kansas.

54.     Plaintiff thereafter notified defendants of his concerns as to the applicability of K.S.A. 21-6503 to the situation involving the sale of Minerva's medical device products.

55.     Defendant Minerva terminated the employment of plaintiff Peterson on or about August 3, 2018.

## COUNT I: DISABILITY DISCRIMINATION IN VIOLATION OF

## 42 U.S.C. 12101 et seq.

56.     Plaintiff incorporates all of the foregoing allegations, and further states as follows.

57.     Plaintiff Peterson served defendant Minerva as an Area Sales Director and Territory Manager in a highly appropriate and productive manner for over two and a half years, through the date of his involuntary termination from employment with Minerva on or about August 3, 2018.

58.     Plaintiff Peterson successfully performed his duties at a satisfactory level throughout the duration of his active employment with defendant Minerva.

59.     During the course of his employment with defendant Minerva, plaintiff Peterson possessed one or more disability conditions, including a Stress/Anxiety condition, and a military service condition involving a severe injury to his cervical spine which substantially impaired one or more of his major life activities.

60.     Plaintiff Peterson's disabling conditions were exacerbated by his workplace environment.

61.     Plaintiff Peterson's upper supervision, managerial employees Dave Clapper, Thomas Pendlebury, and Wendy Bowman were aware of his disabling conditions, and plaintiff's requests for reasonable accommodation.

62.     Plaintiff Peterson initiated a leave of absence as a reasonable accommodation for his protected disabling conditions.

63.     Plaintiff also sought various reasonable accommodations to allow for his successful return to the defendant's workplace upon the completion of his protected leave of absence.

64.     Despite plaintiff's proper expressions of concern, defendant denied reasonable

accommodation to plaintiff Peterson.

65.     Ultimately, defendant by and through its managerial employees Dave Clapper, Thomas Pendlebury, and Wendy Bowman unlawfully denied plaintiff Peterson reasonable accommodation, and further denied him the ability to return to work, resulting in his involuntary, unlawful termination from Minerva on or around August 3, 2018.

66.     As a result of the foregoing, plaintiff was the victim of unlawful treatment by defendant Minerva in violation of his rights under the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. ("the ADA").

67.     The actions of defendant as set forth in the preceding paragraphs were unlawful violations of plaintiff's rights to be free of unlawful discrimination under the ADA.

68.     As a direct and proximate result of plaintiff's unlawful treatment by defendant Minerva, as referenced above, plaintiff Peterson has incurred actual and compensatory damages in a total amount exceeding $75,000.00.

69.     Plaintiff is further entitled to an award of punitive damages in an amount exceeding $75,000 due to the malicious and/or reckless conduct of defendant Minerva.

70.     Plaintiff further is entitled to an award of prejudgment interest arising from defendant's unlawful actions.

WHEREFORE, plaintiff Peterson prays for the Court's order against defendant Minerva granting him judgment as against defendant Minerva for his actual and compensatory damages in an amount exceeding $75,000.00, for prejudgment interest, together with such other relief as the Court deems proper.

**COUNT II: RETALIATION IN VIOLATION OF**

**42 U.S.C. 12101 et seq.**

71.     Plaintiff incorporates all of the foregoing allegations, and further states as follows.

72.     Plaintiff Peterson served defendant Minerva as an Area Sales Director and Territory Manager in a highly appropriate and productive manner for over two and a half years, through the date of his involuntary termination from employment with Minerva on or about August 3, 2018.

73.     Plaintiff Peterson successfully performed his duties at a satisfactory level throughout the duration of his active employment with defendant Minerva.

74.     During the course of his employment with defendant Minerva, plaintiff Peterson possessed one or more disability conditions, including a Stress/Anxiety condition, and a military service condition involving a severe injury to his cervical spine which substantially impaired one or more of his major life activities.

75.     Plaintiff Peterson's disabling conditions were exacerbated by his workplace environment.

76.     Plaintiff Peterson's upper supervision, Dave Clapper, Thomas Pendlebury, and Wendy Bowman, were aware of his disabling conditions, and plaintiff's requests for reasonable accommodation.

77.     Plaintiff Peterson initiated a leave of absence as a reasonable accommodation for his protected disabling conditions.

78.     Plaintiff also sought various reasonable accommodations to allow for his successful return to the defendant's workplace upon the completion of his protected leave of absence.

79.     Despite plaintiff's proper expressions of concern, defendant denied reasonable

accommodation to plaintiff Peterson.

80.     Ultimately, defendant Minerva's managerial employees Dave Clapper, Thomas Pendlebury, and Wendy Bowman unlawfully denied plaintiff Peterson the ability to return to work, resulting in his involuntary and unlawfully retaliatory termination from employment with Minerva on or around August 3, 2018.

81.     As a result of the foregoing, plaintiff was the victim of unlawful retaliation by defendant Minerva in violation of his rights under the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. ("the ADA").

82.     The actions of defendant as set forth in the preceding paragraphs were unlawful violations of plaintiff's rights to be free of unlawful retaliation under the ADA.

83.     As a direct and proximate result of plaintiff's unlawful treatment by defendant Minerva, as referenced above, plaintiff Peterson has incurred actual and compensatory damages in a total amount exceeding $75,000.00.

84.     Plaintiff is further entitled to an award of punitive damages in an amount exceeding $75,000 due to the malicious and/or reckless conduct of defendant Minerva.

85.     Plaintiff further is entitled to an award of prejudgment interest arising from defendant's unlawful actions.

WHEREFORE, plaintiff Peterson prays for the Court's order against defendant Minerva granting him judgment as against defendant Minerva for his actual and compensatory damages in an amount exceeding $75,000.00, for prejudgment interest, together with such other relief as the Court deems proper.

## COUNT III: RETALIATION IN VIOLATION OF KANSAS PUBLIC POLICY

86.     Plaintiff incorporates all of the foregoing allegations, and further states as follows.

87.     Plaintiff served defendant Minerva as an Area Sales Director and Territory Manager in a highly appropriate and productive manner for over two and a half years, through the date of his involuntary termination from employment with Minerva on or about August 3, 2018.

88.     In mid-January, 2018, defendant Minerva held a national sales meeting attended by plaintiff Peterson and the Minerva sales force.

89.     At said meeting, one or more discussions occurred which concerned the performance of defendant Minerva's principle endometrial ablation product.

90.     Prior to this meeting, defendant Minerva had introduced a redesigned medical device product (the "ES device"), which effectively served to replace the original "Classic" product manufactured by Minerva.

91.     Plaintiff aided in the design of the ES device.

92.     In early March, 2018, plaintiff Peterson received a confusing and odd voicemail from Pendlebury addressing the "expired devices."

93.     In the latter half of 2017 and first half of 2018, plaintiff fielded numerous inquiries from members of his sales team, and others, as to Minerva's original "Classic" product.

94.     Defendants Minerva and Clapper informed the sales force - including plaintiff Peterson - that Minerva would not recall the "Classic" devices manufactured by Minerva.

95.     Instead, defendants identified to their sales force, inclusive of plaintiff, that sales employees should encourage clients to purchase the "ES" devices, while leaving the company's originals on

14

customers' shelves and in representatives' inventory to be used through the date of their expiration.

96.     Plaintiff Peterson was justifiably concerned by defendant's actions in this regard, as related to the ES and Classic devices.

97.     On or about April 17, 2018, Thomas Pendlebury left plaintiff Peterson an additional voicemail of an odd and confusing nature.

98.     Pendlebury further stated in the above-referenced voicemail to plaintiff that he was greatly concerned about internal communications relative to the issues surrounding the "Classic" device.

99.     At this time, defendants possessed no apparent or express intention to deal with any issues surrounding performance of the "Classic" devices.

100.    On or about April 17, 2018, plaintiff Peterson again contacted defendant's upper management and expressed explicit concerns about the direction given to the sales team relative to the "Classic" device.

101.    Thereafter, defendants continued to refuse to address plaintiff's questions and concerns as to the Classic device.

102.    Plaintiff Peterson justifiably was concerned that defendants' collective lack of action and/ or clarification constituted a violation of Kansas criminal statute K.S.A. 21-6503 making any form of "deception, fraud, false pretense, false promise, or misrepresentation of a material fact … in connection with the sale of any merchandise" criminally illegal in the state of Kansas.

103.    Plaintiff thereafter notified defendants of his concerns as to the applicability of K.S.A. 21-6503 to the situation involving the sale of Minerva's medical device products.

104.    Subsequently, plaintiff Peterson initiated a leave of absence due to his health condition.

105.    Defendant Minerva unlawfully terminated the employment of plaintiff on or about August

3, 2018.

106.   As a result of the foregoing, plaintiff was the victim of unlawful retaliation by defendant Minerva in violation of his right to be free of such retaliation due to his engaging in protected speech, to wit his expressions of concern relative to the applicability of K.S.A. 21-6503 and relevant other state and federal law and regulations.

107.   The actions of defendant as set forth in the preceding paragraphs were unlawful violations of plaintiff's rights to be free of unlawful retaliation under Kansas law and public policy.

108.   As a direct and proximate result of plaintiff's unlawful treatment by defendant Minerva, as referenced above, plaintiff Peterson has incurred actual and compensatory damages in a total amount exceeding $75,000.00.

109.   Plaintiff is further entitled to an award of punitive damages in an amount exceeding $75,000.00 due to the malicious and/or reckless conduct of defendant Minerva.

110.   Plaintiff further is entitled to an award of prejudgment interest arising from defendant's unlawful actions.

WHEREFORE, plaintiff Peterson prays for the Court's order against defendant Minerva granting him judgment as against defendant Minerva for his actual, compensatory, and punitive damages in an amount exceeding $75,000.00, for prejudgment interest, together with such other relief as the Court deems proper.

16

## COUNT IV: BREACH OF IMPLIED CONTRACT

111.    Plaintiff incorporates each of the foregoing allegations and further states as follows.

112.    During the course of his employment relationship with defendant Minerva, plaintiff Peterson was subject to various personnel policies and/or procedures, conduct, business usage, and other matters which were promulgated by Minerva to its workforce, inclusive of plaintiff, which matters constituted an implied contract of employment under Kansas law between defendant and plaintiff.

113.    Among the policies maintained and published by Minerva, and agreed upon by plaintiff, was a stated emphasis on, and purported commitment to, the process of recognizing leaves of absence as protected actions not otherwise subjecting the employee to discharge from his/her employment and, further, the right of any employee to bring matters of underlying violation of Kansas law to the attention of Minerva management.

114.    Despite the existence of the aforementioned policies, among others of relevance, plaintiff was denied the rights otherwise promised him by defendant in and as a result of such policies and practices.

115.    Despite the competent overall performance of his job duties, plaintiff Peterson was involuntarily and unlawfully discharged from his employment by defendant Minerva without proper cause, warning or other notification.

116.    Plaintiff Peterson took a legal leave of absence after his work environment exacerbated his disabilities that were recognized under state law, as well as defendant's upper management.

117.    Due to his taking of a protected leave of absence, plaintiff was involuntarily and unlawfully terminated from his employment from defendant in violation of Minerva's implied contractual commitments made to plaintiff.

118.   Defendant Minerva violated its policies and practices, as aforementioned, and as defined to plaintiff and its workforce.

119.   As a direct and proximate result of the foregoing actions, defendant Minerva breached its implied contractual obligations owed to plaintiff, including but not limited to its duty not to discharge plaintiff except for just cause and/or based upon the proper recognition and implementation of its previously stated policies and practices.

120.   As a result of defendant's breach of its implied contractual obligations owed to plaintiff, plaintiff has suffered actual and consequential damages in an amount exceeding $75,000.00, for which defendant Minerva is liable to him, together with such other damages, including prejudgment interest, as the Court may deem proper.

WHEREFORE, plaintiff Peterson prays for the Court's order against defendant Minerva granting him judgment as against defendant Minerva for his actual and consequential damages in an amount exceeding $75,000.00, for prejudgment interest, together with such other relief as the Court deems proper.

## COUNT V: TORTIOUS INTERFERENCE WITH A
## PROSPECTIVE BUSINESS ADVANTAGE OR RELATIONSHIP

121.    Plaintiff incorporates each of the foregoing allegations and further states as follows.

122.    Plaintiff Peterson applied for one or more job openings outside of defendant Minerva during his term of employment with Minerva.

123.    Plaintiff received interview opportunities with prospective employers, including one from Arrinex, Incorporated ("Arrinex").

124.    Plaintiff interviewed with management of Arrinex, resulting in a positive dialogue with an explicitly referenced opportunity for a job offer to be granted plaintiff by Arrinex.

125.    The opportunity for employment with Arrinex represented a plain business expectancy and/or relationship with the probability of future economic benefit in the form of employment to plaintiff Peterson.

126.    Subsequent to the aforementioned events, plaintiff was advised by Arrinex that it had been contacted by Minerva's CEO, defendant Clapper, whom had knowledge of plaintiff Peterson's job prospects with Arrinex.

127.    Defendant Clapper was acting in this regard in both his individual capacity as well as his capacity as CEO on behalf of defendant Minerva.

128.    When speaking with Arrinex, defendant Clapper intentionally and wrongfully engaged in misconduct by attacking plaintiff Peterson's character and integrity.

129.    Defendant Clapper, upon information and belief, also made intentional and false claims that plaintiff Peterson had cheated on business expenses relating to defendant Minerva.

130.    Because of these unlawful actions by defendant Clapper, plaintiff Peterson thereafter learned

from Arrinex that a "red flag" existed relative to his hiring process.

131.    After checking all professional references plaintiff provided, which were extremely favorable, Arrinex notified plaintiff that it had moved in a "different direction" instead of offering him a position with the company.

132.    The wrongful behavior set forth above of defendant Clapper, acting for and on behalf of defendant Minerva, represents intentional and tortious interference in the prospective business advantage and/or expectancy held by plaintiff Peterson with Arrinex.

133.    Defendants' actions as set forth above constitute one or more acts or unlawful interferences against plaintiff Peterson, and/or evidence of tortious interference, all in violation of plaintiff Peterson's rights to be free of the same, and plaintiff has incurred actual and compensatory damages in an amount exceeding $75,000.00 as a result.

134.    As a direct and proximate result of the foregoing actions, defendant Clapper and Minerva are liable to plaintiff Peterson for his actual and compensatory damages in an amount exceeding $75,000.00.

135.    Defendants actions as described hereinabove were malicious and/or taken in reckless disregard for plaintiff's Peterson's rights, and as such subject defendants to punitive damages in an amount exceeding $75,000.00.

WHEREFORE, plaintiff Peterson prays for the Court's order against defendant Minerva granting him judgment as against defendants Clapper and Minerva, jointly and severally, for his actual, compensatory, and punitive damages in an overall amount exceeding $75,000.00, for prejudgment interest, together with such other relief as the Court deems proper.

**COUNT VI: DECLARATORY RELIEF ARISING FROM DISPUTED
ARBITRATION PROVISION CONCERNING PLAINTIFF'S EMPLOYMENT
BY DEFENDANT MINERVA SURGICAL**

136.    Plaintiff incorporates each of the foregoing allegations and further states as follows.

137.    Pursuant to 28 U.S.C. 2201, plaintiff Peterson seeks a declaration by this Court determining and declaring the existence of certain rights and other legal relations as between he and the named defendants in this action.

138.   Plaintiff Peterson was previously employed by defendant Minerva, and he served Minerva in a sales management role within this judicial district and the state of Kansas generally during the time period relevant to this matter.

139.    Plaintiff Peterson, upon information and belief, executed one or more written agreements detailing certain rights and obligations as between he and the defendants, which agreement document(s) were presented as a condition of employment to Peterson on a take-it-or-leave it basis.

140.   Among the agreements which plaintiff Peterson believes he executed is a document authored in its entirety by defendant Minerva, in which Minerva attempted to require the mandatory arbitration of any dispute arising from plaintiff Peterson's course of employment with Minerva.

141. Within the subject written agreement described in the preceding paragraphs, defendant Minerva mandated that, among other things, plaintiff Peterson would submit employment disputes to mandatory arbitration to be expressly subject to California law, and further that such arbitration proceeding would be held in San Mateo County, California.

142.   The aforementioned requirements placed upon plaintiff Peterson, as relates to the litigation of any matters arising from his employment by defendant Minerva, were – among other things –

unconscionable by their very nature and effect.

143.   Because the subject arbitration requirement was unconscionable, the same must be deemed unenforceable as against plaintiff Peterson.

144.   Further, and alternatively, plaintiff Peterson's direct claim or claims against individual defendant Clapper are not encompassed, or otherwise covered, by any aspect of the subject arbitration clause, and as such any arbitration requirement is not binding upon plaintiff's individual tort claims as against defendant Clapper.

145.   In the further alternative, this Court should declare that the conduct of any arbitration proceeding deemed to be binding upon plaintiff Peterson and his claims arising from his course of employment must be adjudicated in full within this judicial district, inasmuch as all events relevant to plaintiff Peterson's claims arose in this judicial district.

WHEREFORE, plaintiff Peterson prays for the Court's order declaring that any arbitration provision executed by plaintiff at the demand of defendants is void; further, and alternatively, for the Court's order declaring that plaintiff's individual tort claims against defendant Clapper are not subject to arbitration.  In the alternative, further, plaintiff Peterson prays for the Court's order directing that any arbitration proceeding as relates to the claims of plaintiff against defendants shall be adjudicated in full within this judicial district, together with such other relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.


Respectfully Submitted,

LAW OFFICES OF ALBERT F. KUHL



/s/ Albert F. Kuhl
Albert F. Kuhl    KS #12478
15700 College Blvd., Suite 200
Lenexa, KS 66219
Tel.  913.438.2760
Fax: 913.327.8492
Email: Al@KCjoblawyer.com
ATTORNEY FOR PLAINTIFF